MARVIN, Judge.
Defendant-appellant Maes, whose automobile crossed the center line of a public highway and collided almost head on with an approaching vehicle, was indicted for 2d degree murder of the approaching vehicle’s driver, who sustained fatal injury in the collision. LRS 14:30.1.
Maes waived a jury trial and was found guilty of the felony manslaughter, a homicide committed without any intent to cause death or great bodily harm when the offender is engaged in the perpetration of any felony not enumerated in the 1st or 2d degree murder articles of the Criminal Code. LRS 14:31(2)(a).
The trial judge, who sentenced Maes to 10 years at hard labor, found Maes to have been engaged in the perpetration of either or both aggravated battery, LRS 14:34, and aggravated criminal damage to property, LRS 14:55, and concluded that Maes “voluntarily and intentionally” drove his automobile into the path of the approaching vehicle for the purpose of committing suicide.[1]
In one of two assignments of error in this appeal, Maes urges that a reasonable trier of fact could not have concluded beyond a reasonable doubt that he committed every element of the crime of Art. 31(2)(a), felony manslaughter. LRS 15:271. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The trial court concluded that “in view of the applicable law” the facts proved beyond a reasonable doubt, the defendant guilty of manslaughter. We find *1245 that the trial court erred as to the applicable law and reverse and remand for a new trial.
THE FACTS
We adopt the trial court’s factual findings, here chronologically summarized:
Maes and a co-worker began drinking beer about 9:00 on the morning of the fatal accident. Around noon, Maes began drinking whisky. The co-worker left Maes around 3:00 p.m.' At 5:00 p.m. Maes went to a country grocery store where he bought cigarettes and had a brief conversation with a store clerk. The accident occurred about V2 mile from the store two hours after Maes left the store. The co-worker said that he “drank quite a bit” and that Maes was “drinking all day”, but that Maes did not say anything to him that would indicate that Maes wanted to end his life or commit suicide.
The store clerk said that Maes “just came in and got a pack of cigarettes and said I wouldn’t see him any more because he was going to end it all either in the car or jump off of a bridge, that he was going to kill himself ... I asked him not to, and he said nobody likes him, and nobody cared for him, and he walked out the door and he said, ‘I’m going to hit the first thing I see moving’, ...” When asked if she took Maes seriously, the store clerk said, “well, I kind of had my doubts ... I didn’t know whether to take him seriously or not”, and that “in her opinion”, Maes was intoxicated.
A witness to the accident testified that the Maes automobile crossed the center line of the highway and collided almost head on with the approaching vehicle and that neither vehicle displayed any brake lights or reduced speed before the collision, which occurred within a fraction of a second after Maes crossed the center line. Both vehicles were apparently traveling within the speed limit. Maes was apparently going faster than the other car, according to the witness. All of these events occurred within a few miles of the liquor store where Maes and his co-worker began drinking that morning. Maes, apparently the victim of amnesia and serious physical injury, could not recall anything about the accident or the details of his conversation with the store clerk, but did recall drinking with his co-worker and being in the grocery store.
The trial court, in its “verdict”, said [emphasis is ours]:
“Immediately prior to and at the time of the collision both automobiles had their headlights on.
“The weather was cloudy, but the roadway was dry.
if! * * * * ‡
“The collision occurred on a stretch of road that was relatively straight and level, although there was a hill to the west a short distance from the point of the collision, and, further back to the east there were hills.
******
“The exact speed of the vehicles has not been established, and there is no evidence to indicate that either vehicle was travelling at an excessive rate of speed. * * * “Only a fraction of a second elapsed between the time the Maes vehicle swung over into the east bound lane and the occurrence of the collision, and the resulting death of Mr. Free.
“The collision occurred completely in the eastbound lane, which was the correct lane for the Free vehicle and the wrong lane for the Maes vehicle.
“The evidence further established that ... Juan Maes, was an employee ... on a construction project located on the north side of La. Hwy 509 at a location between the scene of the collision and the intersection of La. Hwy. 509 and La. Hwy 1, some five miles to the east. Rain had shut the job down for the day, and Juan Maes, together with a co-worker, Jerry Wayne Henderson, left the job site about 9:00 A.M., on the morning of April 23, 1981. This was pay-day, and they cashed their checks. They went to a liquor store ... and started drinking. They drank for several hours. They both drank beer until noon. After noon Defendant Maes began to drink whiskey as well.
*1246 “Defendant Maes and Mr. Henderson stayed together until around 3:00 P.M.

“The evidence is silent as to the activities of Defendant-Maes from the time he and Mr. Henderson separated, at approximately 3:00 P.M. until 5:00 P.M.
“At about 5:00 P.M., or shortly thereafter, Defendant-Maes entered the Lake Road Grocery, where Mrs. Ada Averett was employed, ... a store located on the north side of La. Hwy. 509 about one-half mile east of the place where Mr. Free was killed later that day.
“Mrs. Averett testified ... that Defendant-Maes told her he was going to end it all, either by jumping off the bridge or by hitting the first thing he saw moving. Defendant-Maes had been drinking. She did not know whether to take him seriously or not. He stayed about 10 minutes. He bought a pack of cigarettes and left.
“Approximately two hours later the fatal collision occurred, as stated, at a point approximately one-half mile west of the Lake Road Grocery.
“The only known eye witness to the collision ... is Johnny Paddie a young man who lived in a mobile home, located on the north side of La. Hwy. 509, a short distance west of the Lake Road Grocery store.
* sfc sfc sfc s(c
“Just prior to the collision, Mr. Paddie was in the kitchen, in the mobile home.... He has a good view of the highway from this window. He saw a man sitting under the wheel of the west bound vehicle, in his right hand lane. He saw this before he saw the east bound vehicle (i.e. the Free automobile) top the hill and head east, in its own, right hand lane. He then saw the Maes vehicle change lanes and drive over into the east bound lane. Neither car braked. * * *
“Defendant-Maes testified that he has no recollection of the collision.
“He does corroborate the testimony of his co-worker, Mr. Henderson. Also, he recalls talking with Mrs. Averett at the Lake Road Grocery, but recalls nothing of their conversation.
“This brings us to a consideration as to what if any, criminal offense was committed by Defendant-Maes.
* * * * * *
“... [T]he evidence does not establish that Defendant had a specific intent to kill or inflict great bodily harm upon ‘another’, and consequently this required element of Second Degree Murder is not established.
“Manslaughter is a responsible verdict to the charge of Second Degree Murder. * * * * * *
“Paragraph two, sub-part (a) provides that manslaughter is a homicide which may be committed without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person. Some of the nonenumerated felonies and misdemeanors affecting the person which constitute elements of such a manslaughter conviction are Aggravated Criminal Damage to Property, LSA-R.S. 14:55; Illegal Use of Weapons, LSA-R.S. 14:94; Aggravated Assault, LSA-R.S. 14:36; and Aggravated Battery, LSA-R.S. 14:34. These crimes which may have the effect of reducing a crime of Second Degree Murder to Manslaughter, do not require specific intent; they are committed upon proof that the accused voluntarily did the act.
“At this point it is appropriate to refer to LSA-R.S. 15:444 which provides in pertinent part, as follows:
‘If a statute has made it a crime to do a particular act, no further proof of intent is required than that accused voluntarily did the act; ... ’
“LSA-R.S. 14:33 defines battery, in part, as follows:
‘Battery is the intentional use of force or violence upon the person of another;

“LSA-R.S. 14:34 defines aggravated battery as follows: *1247 ‘Aggravated battery is a battery committed with a dangerous weapon.’
“A dangerous weapon is defined in LSA-R.S. 14:2, Par. 3, as follows:
‘ “Dangerous weapon” includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.’
“In the instant case the facts include the finding that Defendant voluntarily drove his automobile from its own right hand, west-bound lane of travel, over into the east-bound lane of travel, directly into the path of an east-bound automobile, causing a collision in which great violence occurred to the person of Mr. Free. The evidence establishes that this collision was voluntary and intentional on the part of the Defendant. An automobile, when used in a manner likely to produce death or great bodily harm, constitutes a dangerous weapon, within the meaning and intendment of LSA-R.S. 14:2, Par. 3.
“Thus it is clear that the defendant committed a homicide while engaged in committing aggravated battery, and, accordingly, is guilty of Manslaughter.
“It is further to be noted that the actions of Defendant also constitute engagement in the course of conduct that constitute Aggravated Criminal Damage to property, which is set forth in LSA-R.S. 14:55 as follows:
‘Aggravated criminal damage to property is the intentional damaging of any structure, water craft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion.’
“From the established facts it is clear that Defendant-Maes deliberately collided with the automobile Mr. Free was driving, thereby intentionally damaging the Free vehicle, which is a movable, under circumstances wherein it was foreseeable that human life might be endangered.
“Under the hereinabove recited facts of the instant case, which have been proved beyond a reasonable doubt, and in view of the applicable law, it is the verdict of this Court that the Defendant, Juan R. Maes, is guilty of the criminal offense of Manslaughter.”
ASSIGNMENT NO. 2
While the defendant did not request the trial court to charge itself on the law in accord with CCrP 781, we must find that the trial court erroneously stated the law it considered applicable.
The crimes mentioned by the trial court to support the finding of guilty of felony manslaughter (aggravated battery, Art. 34, and aggravated criminal damage to property, Art. 55) are intentional crimes. LRS 14:11. The element of intent in such a crime must be proved beyond a reasonable doubt even when an unintentional homicide occurs during its commission. LRS 15:271; LRS 14:8-10. One element of the crime of felony manslaughter is that the offender was engaged in the perpetration of a felony not listed in the murder articles. When that felony contains the element of intent, it is incorrect to say that no further proof of that felony is required than that the accused voluntarily did the act. LRS 15:444 is not applicable to an intentional felony which serves as the vehicle for charging felony manslaughter. See State v. Humphrey, 412 So.2d 507 (La.1982), distinguishing what is there called the “perhaps over-broad” statement to the contrary in State v. Brumfield, 329 So.2d 181 (La.1976). LRS 15:271.
Notwithstanding the trial court’s conclusion that the collision was voluntary and intentional and that Maes deliberately collided with [and] intentionally damag[ed] the approaching vehicle, the trial court erred in applying the LRS 15:444 principle that no further proof of intent of the perpetration of the intentional felonies of aggravated battery and aggravated criminal damage to property is required than that the accused voluntarily drove his automobile into the approaching vehicle. In this respect then, and because it was error to conclude that every single element of the crime of either or both the aggravated battery-manslaugh *1248 ter and the aggravated criminal damage to property-manslaughter was proved beyond a reasonable doubt simply by finding that the offender’s act was voluntary, we shall reverse and remand for a new trial. LRS 14:11, 15:271. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); State v. Mart, 419 So.2d 1216 (La.1982). We do not reach the question of the Jackson v. Virginia sufficiency of evidence standard because the erroneous application of the LRS 15:444 principle in this prosecution requires reversal.
ASSIGNMENT NO. 1
Because we remand for a new trial, we shall pass on defendant’s first assignment of error. This assignment complains that defendant was denied the privilege of impeaching a witness by showing a prior contradictory statement. LRS 15:493.[2]
The trial court sustained the state’s objection that the questions asked to the impeaching witness about the alleged prior contradictory statement of the state’s witness was leading and suggestive of answer. Under the clear language of the statute, where the witness does not admit making the particular prior contradictory statement, evidence that the witness did make such a statement is admissible. Where a proper foundation is laid according to LRS 15:493, the impeaching witness may be asked whether the witness under attack made the particular statement used in laying the foundation for impeachment, notwithstanding that the question, when construed in other circumstances and in isolation, might be considered leading. Wig-more says that this is one of the many areas where a leading question is commonly allowed. 3 Wigmore § 779.
DECREE
Defendant’s conviction is reversed and the case is remanded for a new trial in accordance with law.

. The trial court’s verdict is quoted in the body of this opinion. Omissions therefrom include only some matters that are not relevant to the issues raised in this appeal and some quotations from the statutes.

. LRS 15:493 reads:
“Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible.”